United States Court of Appeals,

Fifth Circuit.

No. 92–4361

Summary Calendar.

W.H. NIMON, Bonnie K. Nimon, and W.H. Nimon, Trustee for Bonnie K. Nimon, Petitioners,

v.

RESOLUTION TRUST CORPORATION, Respondent.

Oct. 21, 1992.

Petition for Review of Decision of the Resolution Trust Corporation.

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We visit again the plague of failures in the thrift industry. Petitioners W.H. Nimon and his wife, Bonnie K. Nimon, seek review of a decision of the Resolution Trust Corporati on, denying federal deposit insurance coverage of funds deposited in the now-defunct Southwest Federal Savings and Loan Association. Because RTC's determination was not arbitrary and capricious, we uphold its decision. We also find that the procedures followed in this case provided the process due under the Fifth Amendment.

I.

We are concerned with accounts and certificates of deposits petitioners maintained, in various capacities, in Southwest Federal Savings and Loan Association in Spring of 1991. The first two were certificates of deposit in the principal amount of $50,000 each. Certificate of deposit no. 14–120633–2, Certificate A, and certificate of deposit no. 14–120632–4, Certificate B, were both owned by Mr. and Mrs. Nimon, as joint tenants. Certificate A matured on May 14, 1991, with less than $200 accrued interest; Certificate B matured about June 3, 1991, with similar accrued interest. A third certificate of deposit, no. 14–138531–6, Certificate C, was in the name of W.H. Nimon, Trustee for Bonnie K. Nimon, and matured on May 14, 1991. The $98,000 from Certificate C were

used to create a money market account on that date, with Mr. Nimon as trustee for Mrs. Nimon, the Trustee Account. Finally, there was another money market account, containing about $75,000, held in the name of Mr. Nimon, the Individual Account.

When Certificates A and B matured in May and early June, respectively, their funds remained idle. On or about June 21, an employee of Southwest attempted to contact Mr. Nimon regarding the disposition of these funds. When Mr. Nimon replied by telephoning Southwest on June 24, 1991, he orally approved the transfer of the funds from Certificates A and B to a money market account. Those funds, totalling just more than $100,000, were deposited in the Trustee Account on that date. Mr. Nimon claims that it was his understanding that the transfers he authorized would be to an account with deposit insurance covering the face amounts of Certificates A and B. After these transfers, however, the Trustee Account contained more than $198,000.

On July 26, 1991, the Office of Thrift Supervision closed Southwest and appointed RTC as receiver. On that date, only the Individual Account with $75,085 and the Trustee Account with $199,940 remained open.

In October, 1991, RTC notified the Nimons that some of their funds in Southwest were excess and uninsured. RTC initially stated that insurance coverage extended to the entire Individual Account and to the first $100,000 of the Trustee Account. RTC also stated that coverage would be extended to an additional $24,915 of the Trustee Account, because that amount of Mr. Nimon's individual coverage had not been exhausted by his individual account.

The Nimons requested RTC to reconsider this decision. They submitted a statement of facts for RTC's consideration, which maintained that the funds of Certificates A and B had been transferred to an account without adequate insurance coverage without their authorization.

RTC did reconsider its decision, finding that the Nimons were entitled to even less coverage. On December 4, 1991, RTC modified its decision and stated that only $100,000 in the Trustee Account were insured, and that its initial allowance of an additional $24,915 as part of Mr. Nimon's coverage had been mistaken. Once again, the Nimons sought to have RTC reconsider its decision. On February 6, 1992, RTC denied this application for reconsideration. RTC's letter of February 6 stated the reasons for its coverage decision, and stated that it was RTC's "final determination."

## II.

Our jurisdiction, the first question, turns on the proper construction of 12 U.S.C. § 1821(f). This section was among those rewritten by FIRREA in 1989. The statute, governing the payment of deposit insurance by the Federal Deposit Insurance Corporation or, as here, RTC, reads in pertinent part:

(3) Resolution of disputes

(A) Resolutions in accordance to corporation regulations

In the case of any disputed claim relating to any insured deposit or any determination of insurance coverage with respect to any deposit, the Corporation may resolve such disputed claim in accordance with regulations prescribed by the Corporation establishing procedures for resolving such claims.

(B) Adjudication of claims

If the Corporation has not prescribed regulations establishing procedures for resolving disputed claims, the Corporation may require the final determination of a court of competent jurisdiction before paying any such claim.

(4) Review of corporation's determination

Final determination made by the Corporation shall be reviewable in accordance with chapter 7 of Title 5 by the United States Court of Appeals for the District of Columbia or the court of appeals for the Federal judicial circuit where the principal place of business of the depository institution is located.

FDIC and RTC have not prescribed regulations governing deposit insurance coverage disputes. RTC policy has been to resolve disputes on a informal basis.

RTC argues that this review of its decision should be in the federal district court, not the court of appeals. This has practical merit but, unhappily relies upon a flawed reading of section 1821(f).

First, RTC correctly notes that subsection 1821(f)(3)(A) has no application, because no regulations governing coverage disputes have been prescribed. RTC then concludes that subsection (f)(3)(B) requires that a "final determination" reviewable by this court must be made by a court of competent jurisdiction, instead of by RTC. This ignores that by the statute RTC *may* require a court determination—it does not require RTC to do so. That is, the statute permits RTC to itself render a final determination, even though there are no regulations formalizing its procedures. In this case, although RTC followed informal procedures, its last pronouncement denying the Nimons' request for reconsideration is for all effects and purposes—and as its own terms state—the "final determination" of this dispute. *See Abrams v. Federal Deposit Ins. Corp.,* 938 F.2d 22, 25 (2d Cir.1991) (rejecting FDIC's assertion of same jurisdiction argument).[1]

Once there has been a final determination of the coverage dispute by RTC, subsection 1821(f)(4) provides for review by the court of appeals. This provision controls, regardless of the fact, which RTC emphasizes, that the pre-FIRREA statutory scheme provided for initial review of FDIC and FSLIC insurance coverage determinations in federal district court. *See e.g. Patrick A. Hymel, CLU, & Assoc. v. FDIC,* 925 F.2d 881 (5th Cir.1991) (reviewing coverage decision of district court); *Spawn v. Western Bank–Westheimer,* 925 F.2d 885 (5th Cir.1991) (same).

RTC identifies a practical reason why the district court might be a better forum for the initial review of RTC coverage decisions. Because RTC has no formalized procedures to resolve disputes, no formal fact finding has taken place. Contrast appellate court review of FDIC enforcement cases under 12 U.S.C. § 1818(h). Procedural regulations exist for the administrative determination of those

---

[1]Having rejected RTC's contention that it cannot render a final determination in the absence of regulations, we need not reach its argument that a court of competent jurisdiction pursuant to section 1821(f)(3)(B) must be a federal district court.

cases, see 12 C.F.R. Part 308, so that a record with findings of fact and conclusions of law results for the court of appeals to review.  In this case, RTC has neither verified nor denied the asserted facts on which the Nimons rely.  Although RTC contends here that the truthfulness of those assertions is irrelevant, there may be cases where there are disputed facts, not found in the depository institution's records, and critical to the outcome of the review.[2]  Nonetheless, we agree with the Second Circuit in concluding that Congress used plain language in 12 U.S.C. § 1821(f)(4) which specifies that the courts of appeal will be the fora of these reviews.  *See Abrams,* 938 F.2d at 25.

### III.

Petitioners contend that RTC's denial of insurance coverage to excess funds in the Trustee Account was error, caused in part by RTC's refusal to consider the circumstances surrounding the transfer of funds to that account.  In reaching this decision, RTC was acting as an insurer of deposits, and thus as an authority of the government of the United States.  *See Hymel,* 925 F.2d at 883 (holding that FSLIC as insurer acts as government authority).  Therefore, as 12 U.S.C. § 1821(f)(4) recognizes, this decision is reviewed according to the Administrative Procedure Act and may only be set aside if found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  *Humel,* 925 F.2d at 883;  *see also Abdulla Fouad & Sons v. Federal Deposit Ins. Corp.,* 898 F.2d 482, 483 (5th Cir.1990) (holding FDIC insurance coverage decisions are reviewed under arbitrary and capricious test).

In deciding whether an insuring agency's decision was arbitrary and capricious, this court considers whether the agency followed its governing regulations.  In *Abdulla Fouad,* we found that the FDIC acted reasonably when looking to bank deposit records alone, as the regulations require, and refusing to consider extrinsic evidence of account ownership.  898 F.2d at 484.

---

[2]Indeed, in *Abrams v. FDIC,* 938 F.2d 22 (2d Cir.1991), in which the Second Circuit held that judicial review of deposit insurance coverage decisions must occur in the court of appeals, the panel remanded the dispute to the FDIC for, in effect, the creation of a proper record explaining its denial of coverage.

IV.

Petitioners present two alternative claims for relief.  First, they argue that RTC erred in refusing to treat the proceeds of Certificates A and B as joint tenancy funds, insurable separately from the other funds in the Trustee Account.  In the alternative, they seek to reinstate RTC's initial decision to allow $24,915 of the Trustee Account to be insured along with the funds in Mr. Nimon's Individual Account.  We find that RTC's decisions regarding both arguments conformed to the regulations, and were not arbitrary and capricious.

Congress authorized FDIC to promulgate regulations defining the extent of deposit insurance coverage.  12 U.S.C. § 1813(m)(1).  Those regulations, set forth in 12 C.F.R. Part 330, govern RTC coverage decisions.  In deciding whether RTC acted reasonably, we consider whether RTC acted in accordance with prescribed regulations.  We give deference to the interpretation of statutes and regulations by the agencies charged with their implementation.  *Hymel,* 925 F.2d at 884;  *Jones v. Federal Deposit Ins. Corp.,* 748 F.2d 1400, 1405 (10th Cir.1984).

The deposit insurance regulations state that coverage is based upon the ownership rights and capacities in which deposit accounts are maintained at depository institutions.  12 C.F.R. § 330.3.  "All deposits in an insured depository institution which are maintained in the same right and capacity (by or for the benefit of a particular depositor or depositors) shall be added together and insured ... Deposits maintained in different rights and capacities, as recognized under this part, shall be insured separately from each other."  *Id.*  RTC will determine the ownership capacity in which an account is maintained by reference to the depository institution's deposit account records.  12 C.F.R. § 330.4(a).[3]  If RTC determines that the deposit account records are clear and unambiguous, those records shall be binding on the depositor, and no other records will be considered.  *Id.*

---

[3]Deposit account records are defined as "account ledgers, signature cards, certificates of deposit, ... and other books and records of the insured depository institution, including records maintained by computer, which relate to [its] deposit taking function, but does not mean account statements, deposit slips, items deposited or cancelled checks."  12 C.F.R. § 330.1(d).

In its final determination regarding the Nimons, RTC found that Southwest's deposit account records were clear and unambiguous. Those records showed that one account containing $75,085 was maintained by Mr. Nimon in his individual capacity. The records also showed a second account, maintained by Mr. Nimon in his capacity as trustee for Mrs. Nimon, and therefore separately insurable up to $100,000. The petitioners are bound by the ownership rights and capacities shown by these records.

RTC insists that it cannot consider the subjective intention of depositors in setting up or structuring their accounts. When RTC is appointed as a receiver of a failed institution, it acts as both a corporate insurer of deposits and a corporate receiver. The intent of the statutory and regulatory schemes is that the FDIC or RTC move quickly in order to maintain the going concern value of failed institutions and to avoid significant disruptions in their banking services. *Jones v. Federal Deposit Ins. Corp.,* 748 F.2d 1400, 1402 (10th Cir.1984). The deposit insurance agencies operate under time constraints which justify rules that they rely upon the failed institution's books and records. *See Gunter v. Hutcheson,* 674 F.2d 862, 870 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

The Nimons urge that RTC must look beyond the deposit account records in this case because funds were transferred to the accounts shown without proper authorization. RTC replies that it cannot consider and certainly is not bound by errors committed by a failed institution's employees, or incorrect instructions given to them.[4]

As petitioners admit, their argument is essentially that due to an improper transfer, the account records incorrectly show the ownership of some of the Trustee Account funds. The Nimons contend that about $100,000 of those funds actually were owned by them in a joint tenancy capacity, and

---

[4]We are not persuaded by petitioners' argument that RTC must accept responsibility for errors of the failed depository institution because RTC was already acting as conservator of the institution at the time of these transfers.

therefore should be separately insured. But this position must fail, because when the account records are clear and unambiguous, their statement of the capacity in which funds are owned is conclusive.

Moreover, we are not persuaded that the transfers to the Trustee Account occurred without authorization. The Nimons acknowledge that on June 24, 1991, Mr. Nimon spoke with a Southwest employee, and allowed the transfer of the proceeds of Certificates A and B to a money market account. They insist, however, that Mr. Nimon did not orally authorize transfers into the Trustee Account, which already contained funds nearly reaching the $100,000 coverage limit. Petitioners point to the fact that they left the proceeds of Certificates A and B idle, earning no interest, for several weeks rather than place them in an account where they would be unprotected. Outside of the Trustee Account, these funds constituted a joint account, qualifying for separate coverage from other accounts under 12 C.F.R. § 330.7. The Nimons urge us to consider all of their conduct and believe that they would not have authorized the transfer of these funds into the Trustee Account had they known of it.

The fact that Mr. Nimon may have misunderstood what account was involved does not mean that the transfer was unauthorized. Although petitioners urge that Mr. Nimon understood that the transfer would be to an account adequately insuring those funds, they fail to establish a reasonable basis for that belief. The Nimons contend that the Southwest employee who usually handled their accounts, Ms. Keisman, knew of their desire to keep all funds in fully insured accounts. Mr. Nimon did not speak with Ms. Keisman on June 24, but assumed that all Southwest employees were aware of this desire and would act accordingly or inform him otherwise. RTC cannot be bound either by Southwest's alleged failure to inform all employees of the Nimons' standing instructions, nor by Mr. Nimon's mistaken assumptions.

Petitioners alternatively seek reinstatement of the initial RTC decision allowing an additional $24,915 of the Trustee Account to be insured, because Mr. Nimon's Individual Account only "used

up" $75,085 of the insurance available to him personally. On reconsideration, RTC modified its decision and rejected that allowance on the grounds that funds in different accounts are maintained in separate capacities and so are separately insured. The Trustee Account was a revocable trust account, owned by Mr. Nimon for the benefit of Mrs. Nimon, and governed by 12 C.F.R. § 330.8. There is no dispute that, under section 330.8(a), $100,000 of coverage applies as to the beneficiary, regardless of other coverage applying to the owner or beneficiary. Thus, the account with Mrs. Nimon as beneficiary was entitled to $100,000 of coverage.

The Nimons argue that Mr. Nimon, as owner of the Trustee Account, is entitled to additional coverage of funds in the account. They point to the last sentence of section 330.8(a), which reads, "[t]he settlor of a revocable trust account shall be presumed to own the funds deposited into the account." Since $75,085 in funds owned by Mr. Nimon were insured in the Individual Account, they believe that he is entitled to coverage of other deposited funds he owned, up to $100,000. This argument violates the general principles of 12 C.F.R. § 330.3(a), that "[d]eposits maintained in different rights and capacities ... shall be insured separately from each other." Ownership alone is not decisive in determining coverage. 12 C.F.R. § 330.3(h). The capacity in which a particular account is maintained must be considered. Mr. Nimon owned both the Individual Account and the Trustee Account, but he owned those two accounts in different capacities—one as an individual, the other as trustee. 12 C.F.R. § 330.8(a) states that trust accounts are insured separately from other accounts of the trustee/owner. Thus, each has its own separate coverage. Any excess coverage applicable to one account cannot be applied to the other.

V.

Petitioners argue that they have been denied their due process rights in the resolution of this deposit insurance coverage dispute. They deny receiving a constitutionally adequate hearing and an opportunity to be heard. The Nimons fault RTC for failing to prescribe procedural rules that would allow for oral argument, the production of evidence, and a hearing before an impartial official.

There is no dispute that RTC's decision affects a property right of the Nimons, implicating the due process clause of the U.S. Constitution. The issue becomes whether the procedures followed by RTC provided an adequate hearing for petitioners satisfying the demands of due process. We make three inquiries in determining the requirements of due process in a particular case: (1) the private interests that will be affected by the agency's action; (2) the risk of erroneous deprivation due to the procedures used and the reduction of that risk through additional or substitute procedures; and (3) the interests of the government, including the burden that would be imposed by additional or substitute procedures. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

RTC has no regulations formalizing insurance dispute resolution. Rather, it follows informal procedures. In this case, RTC issued a written decision denying coverage on about $75,025 in funds in the Trustee Account in October, 1991. When petitioners contacted RTC regarding this decision, they were informed of their right to request that RTC review this initial determination. Therefore, on October 31, 1991, the Nimons submitted a written request for reconsideration, setting forth facts which they believed RTC should consider. Then, in December, 1991, RTC modified its initial determination, denying coverage as to $99,940. RTC notified petitioners of this modification and at this time provided them with a proof of claim form. On February 6, 1992, RTC notified the Nimons that it had considered the arguments and facts they presented, but its final determination was that coverage must be denied as to $99,940. Pursuant to 12 U.S.C. § 1821(f)(4), that determination was brought to this court for review.

"The opportunity for informal consultation with designated personnel empowered to correct a mistaken determination constitutes a "due process hearing' in appropriate circumstances." *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 16 n. 17, 98 S.Ct. 1554, 1564 n. 17, 56 L.Ed.2d 30 (1978). We consider the three *Mathews* factors to determine whether the informal process followed by RTC in this case was appropriate under these circumstances. The Nimons' interest at stake is

significant, as RTC's coverage decision deprives them of almost $100,000.

Petitioners argue that the risk of erroneous deprivation in such a case is great because RTC refuses to consider any extrinsic evidence regarding how funds were transferred to the accounts involved. If funds are transferred to an account with inadequate insurance protection due to clerical error, or without depositor authorization, RTC's narrow consideration of the account records will not disclose that but for the improper transfer, certain funds would be insured. The Nimons ask this court to reduce that risk—in the limited circumstance of a depositor claiming an improper transfer between accounts—by mandating that RTC hold a hearing to receive and consider evidence of an improper transfer.[5]

Petitioners' characterization of the risk of erroneous deprivation is exaggerated. RTC allowed the Nimons to respond to its decisions, and gave them an opportunity to supplement the record. They responded with a letter submitted by their attorney, and set forth a statement of facts for RTC's consideration. This response was clear and complete—it is doubtful that the Nimons' position could have been more adequately presented in an oral hearing. RTC took those asserted facts into consideration before concluding, in its final determination, that they did not affect its decision under the regulations governing the extent of deposit insurance coverage. Because there was no dispute regarding the existence of material facts, no oral hearing was necessary. *Cf. Louisiana Land & Exploration Co. v. Federal Energy Regulatory Comm'n,* 788 F.2d 1132, 1137 (5th Cir.1986).

Finally, the government could be unduly burdened by the imposition of additional procedural requirements. The deposit insurance agencies have a recognized need to rely upon the ownership rights and capacities reflected by an institution's deposit account records when an institution is placed in receivership. *Gunter v. Hutcheson,* 674 F.2d 862, 870 (11th Cir.), *cert. denied,* 459 U.S. 826, 103

---

[5]Petitioners concede that in the "normal case" (not involving claims of improper transfers) a determination made solely from the account records without a formal hearing process may be adequate.

S.Ct. 60, 74 L.Ed.2d 63 (1982). To require RTC to consider extrinsic evidence would undermine the ability to rely upon those records. Prompt payment of deposit insurance in general would be affected. FIRREA does not require FDIC to prescribe regulations governing the resolution of these disputes. Weighing the *Mathews* factors, we are not persuaded that the Constitution requires RTC to do more in these circumstances.

AFFIRMED.