United States Court of Appeals,

Fifth Circuit.

No. 93-5189.

FIRST AMERICAN BANK, Petitioner,

v.

RESOLUTION TRUST CORPORATION, in its Corporate Capacity, Respondent.

Sept. 8, 1994.

Petition for Review of a Decision of the Resolution Trust Corporation.

Before GARWOOD, SMITH, and STEWART, Circuit Judges.

STEWART, Circuit Judge:

Petitioner, First American Bank, seeks review of a final determination of the Resolution Trust Corporation ("RTC") denying federal deposit insurance coverage for funds deposited in the now-defunct Spindletop Savings Association, F.A. Because the RTC's decision was arbitrary and capricious, an abuse of discretion, and not in accordance with law, we reverse.

I.

FACTS AND PROCEDURAL HISTORY

This case involves two certificates of deposit petitioner purchased in 1989 and 1990 at Spindletop Savings Association and its successor, Spindletop Savings Association, F.A., respectively. At issue is whether each certificate of deposit ("CD") is entitled to separate deposit insurance coverage. On April 18, 1989, First American Bank ("FAB") purchased a certificate of deposit ("CD # 1") from Spindletop Savings Association ("Old Spindletop"). This CD

1

was in the amount of $98,000 and had a maturity date of September 14, 1990.

After the purchase of CD # 1, Old Spindletop failed. On September 13, 1989, Old Spindletop was placed into receivership with the RTC. On that same date, the Office of Thrift Supervision chartered a new federal thrift, Spindletop Savings Association, F.A. ("New Spindletop"). Thus, New Spindletop was chartered as a separate entity from Old Spindletop, and it had a separate RTC insurance number. Also on September 13, 1989, the RTC, as receiver for Old Spindletop, entered into a pass-through purchase and assumption agreement with New Spindletop, wherein Old Spindletop's assets and outstanding deposits and secured liabilities were transferred to New Spindletop. New Spindletop was simultaneously placed in conservatorship, with the RTC being appointed conservator.

On April 24, 1990, FAB purchased CD # 2 in the amount of $99,000 from New Spindletop, with a maturity date of September 24, 1990.

On June 1, 1990, prior to the maturity date of either CD # 1 or CD # 2, New Spindletop was also closed and placed into receivership with the RTC. At this time, the RTC entered into an agreement with First City, Texas—Beaumont, N.A. ("First City"), wherein certain assets and liabilities were transferred to and assumed by First City. Through this transaction, the RTC in its corporate capacity transferred the insured amount of each depositor's accounts previously held by New Spindletop (including

2

the deposits that had come from Old Spindletop) to First City. These insured deposits were immediately available at First City to each former depositor of New Spindletop, even if the associated certificates of deposits had not otherwise matured.

For each depositor, the maximum insured amount for each transferred deposit was $100,000.[1]   The RTC claims that it satisfied its $100,000 insurance obligation to FAB by transferring CD # 2 to First City.  Accordingly, the RTC did not transfer CD # 1 because the transfer of both certificates would have resulted in a payment to FAB of more than the $100,000 insurance limit.

On June 8, 1990, FAB redeemed CD # 2 from First City without incident.  On August 3, 1990, FAB sought payment on CD # 1 from First City.  Payment was denied.  FAB then presented a written request to the RTC for deposit insurance on CD # 1.  On June 22, 1993, the RTC made its final determination, denying FAB's claim. FAB appeals this adverse determination pursuant to 12 U.S.C. § 1821(f)(4).

## II.

### GENERAL LEGAL PRINCIPLES

FAB contends that the RTC's denial of insurance coverage for CD # 1 was arbitrary and capricious, an abuse of discretion and not in accordance with law.  FAB asserts that the insurance coverage for CD # 1 is separate from any coverage afforded for CD # 2.  It argues that in denying this insurance coverage, the RTC misread the clear and unambiguous language of 12 U.S.C. § 1818(q) and

_____

[1]*See* 12 U.S.C. § 1821.

3

wrongfully relied on five unpublished FSLIC opinion letters construing the applicable statutory language. We agree.

Pursuant to 12 U.S.C. § 1821(f)(4), a final determination of the RTC is reviewable in accordance with the Administrative Procedure Act. Under the Administrative Procedure Act, the RTC's determination in this case may be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706. *See also, Nimon v. Resolution Trust Corp.,* 975 F.2d 240, 244 (5th Cir.1992). Furthermore, the U.S. Supreme Court has held that, unless Congress has directly spoken to the precise question at issue, considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-844, 104 S.Ct. 2778, 2781-2782, 81 L.Ed.2d 694 (1984). Thus, where the agency's interpretation of the applicable deposit statute and regulations is equally as persuasive as the claimant's, the reviewing court should uphold the agency's decision. *Hymel v. Federal Deposit Ins. Corp.,* 925 F.2d 881 (5th Cir.1991).

However, where an agency has promulgated a regulation or adopted an interpretation that is in conflict with a statute's plain meaning, the reviewing court is not required to give deference to the agency's interpretation. *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). "If the statute is clear and unambiguous, "that is the end of the matter, for the court, as well as the agency, must give effect to

4

the unambiguously expressed intent of Congress.' ... The traditional deference courts pay to agency interpretations is not to be applied to alter the clearly expressed intent of Congress." *K Mart, supra,* 486 U.S. at 291, 108 S.Ct. at 1817, quoting *Chevron, supra,* 467 U.S. at 842-843, 104 S.Ct. at 2781-2782, 81 L.Ed.2d 694.

In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished. *Estate of Cowart v. Nicklos Drilling Co.,* --- U.S. ----, ----, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992), citing *Demarest v. Manspeaker,* 498 U.S. 184, 188, 111 S.Ct. 599, 603, 112 L.Ed.2d 608 (1991).

The governing statutory language in this case is codified at 12 U.S.C. § 1818(q), which provides in pertinent part as follows:

*Assumption of liabilities*

> Whenever the liabilities of an insured depository institution for deposits shall have been assumed by another insured depository institution or depository institutions, whether by way of merger, consolidation, or other statutory assumption, or pursuant to contract (1) the insured status of the depository institution whose liabilities are so assumed shall terminate on the date of receipt by the Corporation of satisfactory evidence of such assumption; (2) *the separate insurance of all deposits so assumed shall terminate at the end of six months from the date such assumption takes effect or, in the case of any time deposit, the earliest maturity date after the six-month period*....

12 U.S.C. § 1818(q) (emphasis added).

III.

DISCUSSION

*A. Contentions of the parties*

Petitioner, FAB, contends that the language of 12 U.S.C. §

5

1818(q) supports its view that the RTC is required to provide insurance coverage for the deposits of a failed institution that is *separate* from the insurance coverage for the deposits of the succeeding association, and that the separate coverage for a time deposit such as a CD should extend until such time deposit matures. Because CD # 1 never reached its maturity date, FAB maintains that it should have been separately insured for up to $100,000 under the statute.

The RTC responds by asserting that the statute should apply only when the separate deposit insurance existed for the deposit account of an individual depositor at *both* institutions *prior* to the assumption of the deposit liabilities of one institution by the other. In support of this position, the RTC argues that the purpose of the statute is to protect depositors from suddenly becoming uninsured through no fault of their own as the result of a savings and loan merger. In this case, FAB purchased CD # 2 from New Spindletop *after* New Spindletop assumed Old Spindletop's deposits. Thus, the RTC argues that no "separate" protection should be extended since the purchase of CD # 2 was a new investment decision on the part of FAB and thus FAB voluntarily acted to cause more than $100,000 to be on deposit at New Spindletop, in contrast to depositors who end up with more than $100,000 at a single institution through no act of their own, such as through a merger. The RTC contends that the statute should only protect those who do not voluntarily cause excess deposits to end up in a single institution. In particular, the RTC argues that

6

Congress' use of the term "separate insurance" evidences a legislative intent which supports its view that the individual depositor must have deposits in both the old institution and the new one at the time of merger in order to have separate insurance for each deposit. Additionally, the RTC asserts that Congress would not have used the word "separate" in § 1818(q) had it not intended to require that other deposits already be in existence at the time of merger, consolidation, pass-through, etc., because a thing cannot be "separate" unless it is considered with reference to something else. Thus, in the RTC's view there can be no "separate" insurance unless FAB had at least two "separate" accounts when New Spindletop assumed Old Spindletop's deposits at the time of merger.

*B. Statutory Interpretation of § 1818(q)*

The statute provides that when the deposits of one insured depositing institution have been assumed by another, "the separate insurance of *deposits so assumed* shall terminate" at the end of the prescribed grace period. The statute focuses on the *assumed* deposits, and does not require that each depositor have a duplicate deposit in the *assuming* institution *at the time of assumption* in order to take advantage of the separate insurance coverage.

The RTC cites the legislative history of 12 U.S.C. § 1728(a) in support of its position that Congress intended to provide separate insurance only in cases where deposits existed in both institutions prior to merger. This statute was the Federal Savings and Loan Insurance Corporation ("FSLIC") counterpart to § 1818(q)

7

and was repealed when the FSLIC was abolished through the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). It contained language very similar to that in § 1818(q). However, because we find that the language of § 1818(q) clearly states the congressional intent, we need not resort to the legislative history of a repealed statute in order to resolve the issue at hand.

We find the RTC's argument untenable in light of our reading of the statute. We construe § 1818(q) to mean exactly what it says: that any assumed time deposit shall be accorded *separate* deposit insurance during the statutory grace period. As used in § 1818(q) the word "separate" means apart from and in addition to any other deposit insurance that *may or may not exist* at the time of assumption. The assumed time deposit, CD # 1, was issued before its assumption by New Spindletop and, upon assumption, it remained insured. The existence of this insurance did not depend on whether FAB had any other deposits at the time of assumption or that it may have made after the assumption. In this case, § 1818(q) placed no restriction upon separate insurance coverage other than the statutory grace period. Insurance on CD # 1 was automatically maintained during the statutory grace period. According to the statute, FAB also had an additional $100,000 coverage for any new deposits. Consequently, both CD # 1 and CD # 2 were covered for up to $100,000 each. To hold otherwise would be to read into § 1818(q) an exception or limitation that simply is not there.

We interpret § 1818(q) to mean that CD # 1 was insured for up

to $100,000 during the statutory grace period.  This insurance coverage was separate and apart from and in addition to the $100,000 coverage that was applicable to CD # 2 because it was a new time deposit made at the assuming institution, New Spindletop, after its assumption of Old Spindletop's liabilities.

The RTC urges that we give *Chevron* deference to its decision. It argues that we are obligated to regard as controlling a reasonable, consistently applied interpretation construing the statute by the government.  *Nimon, supra,* 975 F.2d at 245. Accordingly, we must note any relevant agency opinion of the statute at issue.  The RTC offers five unpublished opinion letters of the now-abolished FSLIC in support of its position that the FSLIC has consistently interpreted the separate insurance provisions as applying only to deposits held by an individual *at the time of merger.*[2]  Assuming, *arguendo,* that any authority of these five opinion letters survived the demise of the FSLIC, we conclude that they are not persuasive in view of their direct contradiction to the text of § 1818(q).  *Chevron* and its progeny do not require courts to defer to agency opinions which are incongruent with statutory text.

---

[2]The five letters range in date from 1985 to 1988, and each appears to have been issued in response to a specific inquiry about separate deposit insurance coverage under § 1728(a), which was the FSLIC counterpart to § 1818(q).  Four of the letters were signed by the director of the insurance division of FSLIC.  One was signed by the director of the regulations and legislation division at FSLIC.  The letters indicate FSLIC's position was that, in the case of an acquisition or merger, accounts in an acquiring institution were afforded separate coverage only if they were opened prior to such acquisition or merger.

While we do not reach the issue of whether unpublished FSLIC opinion letters might constitute valid precedent in other cases, we decline to defer to them in this case because the FSLIC's interpretation of the applicable statutory language as espoused in the five opinion letters is so clearly contrary to the plain and unambiguous language of the statute.

In direct contrast to the FSLIC letters, the FDIC previously has concluded in a *published* opinion letter that deposits made in a new institution after the time of merger *are* covered by separate insurance. Thus, the FDIC has interpreted § 1818(q) in the same way we do today. In FDIC Advisory Opinion 89-11, dated March 21, 1989,[3] nineteen failed banks in Texas were merged into a newly formed "Bridge Bank" (not unlike the situation with Old Spindletop and New Spindletop), and the FDIC specifically stated that "all of the deposits assumed from the insolvent [banks] will be separately insured from any new deposits established by the same customer(s) with the Bridge Bank."

FAB argues that FDIC Advisory Opinion 89-11 should control this case. The RTC argues that we should defer to the FSLIC interpretations of the statutory language, citing FDIC Advisory Opinion 90-03 (dated January 9, 1990) for the proposition that FIRREA requires that FSLIC interpretations govern in this case rather than FDIC interpretations. While we are not required to resolve the issue of whether FSLIC or FDIC interpretations would

---

[3]This FDIC advisory opinion predates the creation of the RTC on August 7, 1989, pursuant to FIRREA.

10

govern in the event of a statutory ambiguity, we note that FDIC Advisory Opinion 89-11 is consistent with our interpretation of the statute.  We hold that CD # 1 was afforded separate insurance coverage under the clear language of § 1818(q) and that the RTC's determination to the contrary was arbitrary, capricious, an abuse of discretion, and not in accordance with law.  For the foregoing reasons, the final determination of the RTC is REVERSED.

REVERSED.