FLETCHER VILLAGE CONDOMINIUM ASSOCIATION, Howland Village II Condominium Association, and Billington Village II Condominium Association

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Boston Trade Bank, and Federal Deposit Insurance Corporation, in its Corporate Capacity.

Civ. A. No. 92–10691–RGS.

United States District Court, D. Massachusetts.

Oct. 14, 1994.

David L. Klebanoff, Boston, MA, for plaintiffs.

Thomas L. Holzman, Fed. Deposit Ins. Corp., Washington, DC, for defendants.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Plaintiff condominium associations brought this lawsuit against the Federal Deposit Insurance Corporation ("FDIC") in its capacity as receiver of the defunct Boston Trade Bank ("BTB") and in its corporate capacity as an insurer of the bank's deposits. Plaintiffs allege that BTB, in disregard of oral instructions, caused money entrusted for the purchase of U.S. Treasury bills to be deposited instead into the plaintiffs' regular checking accounts. At the time BTB became insolvent, these accounts contained amounts in excess of the federal deposit insurance limits. Plaintiffs are seeking to recover the excess funds. The FDIC now moves to dismiss, or in the alternative, for summary judgment.

### FACTS

The undisputed material facts are as follows. Plaintiffs are three associations of condominium owners. The plaintiffs instructed Corcoran Jennison, their management company, to invest condominium fee receipts in Treasury bills through BTB. The Treasury bills were purchased under a program called Treasury Direct. The program allows the Federal Reserve Bank to credit and debit an investor's bank account automatically when Treasury bills are purchased or sold.

According to the plaintiffs, Corcoran Jennison orally instructed BTB to reinvest the proceeds of the bills as they matured, one of the options offered by Treasury Direct. According to the FDIC, BTB's records do not

reflect such an understanding.[1] The Treasury Direct form filled out by a BTB employee directs the Federal Reserve to deposit the proceeds into plaintiffs' BTB checking accounts. On April 29, 1991, the bills at issue matured and the Federal Reserve credited the funds to plaintiffs' BTB accounts. On May 3, 1991, BTB was declared insolvent and the FDIC was appointed receiver. Each plaintiff's checking account exceeded the FDIC $100,000 insured limit. This excess, aggregating some $75,000, was deemed by the FDIC to be uninsured.[2]

The FDIC duly notified plaintiffs that the insured portions of their accounts were being transferred to another bank. Corcoran Jennison, on the plaintiffs' behalf, submitted Proof of Claim forms as to the excess funds in a timely fashion. On August 2, 1991, the FDIC issued receiver's certificates to the plaintiffs recognizing them as creditors of BTB. At least one nominal dividend has been paid to each plaintiff out of the receivership assets.[3]

On March 23, 1992, the plaintiffs filed this lawsuit seeking to recover the uninsured balances of their accounts. Count I of the Amended Complaint alleges that the FDIC, as receiver, unlawfully withheld and converted the proceeds of the Treasury bills. Count II, naming the FDIC in its corporate capacity, alleges that the proceeds were held in trust for the plaintiffs and, as such, were separately insured. Count III seeks declaratory relief. The FDIC has moved to dismiss, or in the alternative, for summary judgment, arguing that the D'Oench Duhme doctrine and its statutory analog, 12 U.S.C. § 1823(e), make BTB's written records determinative of the plaintiffs' claims.

## DISCUSSION

Summary judgment is appropriate when, based upon pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Co-op Society,* 3 F.3d 495, 497 (1st Cir.1993). A material fact is one which has "the potential to affect the outcome of the suit under applicable the law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993). In considering the affidavit testimony and documentary evidence provided to the court, the non-moving party is indulged with all favorable inferences. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

The D'Oench Duhme doctrine and its statutory complement, 12 U.S.C. § 1823(e), limit claims and defenses that *borrowers* may assert against the FDIC to those that are verified by a failed bank's records. See *Villafane–Neriz v. FDIC,* 20 F.3d 35, 40 (1st Cir.1994). By its own terms, 12 U.S.C. § 1823(e) does not apply to a bank's liabilities.[4] Because of the intervening decision in *Villafane–Neriz,* the FDIC concedes that it "can no longer maintain that section 1823(e)

---

1. Plaintiffs do not contest the FDIC's characterization of the records. They do argue that they should be allowed to examine the records before a judgment is rendered. The FDIC maintains that copies of all of the relevant records are attached to the pleadings, an assertion that the plaintiffs do not seriously dispute.

2. Plaintiffs seek to recover only the amount traceable to the Treasury bill investment, approximately $52,000 of the $75,000 uninsured loss.

3. The FDIC points out that in the ordinary course of business the Federal Reserve would have mailed the plaintiffs a notice forty-five days prior to the bills coming mature offering a reinvestment opportunity. Although plaintiffs do not deny in so many words receiving such a notice, I will assume that this fact is in dispute. See the affidavit of Joan M. Gibbons, Assistant Vice President of the Federal Reserve Bank of Boston, attached to the FDIC's Reply Memorandum.

4. Section 1823(e) states:

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section ... shall be valid against the FDIC unless such agreement—
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder ...,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) has been, continuously, from the time of its execution, an official record of the depository institution.

applies in this case." The FDIC contends, however, that the D'Oench Duhme doctrine, as an independent expression of common law, defeats this court's jurisdiction over the plaintiff's claims. While the argument that the D'Oench Duhme doctrine is more expansive in its reach than § 1823(e) is technically correct, it does not address the distinction between a bank's assets and liabilities, a distinction which has the same limiting effect on D'Oench Duhme as it does on § 1823(e) [5].

■■■ The FDIC's "core" mission is to protect the interests of a failed bank's depositors. Both D'Oench Duhme and § 1823(e) are intended to serve this objective by "favor[ing] the interests of depositors and creditors of a failed bank ... over the 'interests of borrowers.'" *Villafane–Neriz, supra* at 40 (quoting *Bell & Murphy and Associates, Inc. v. Interfirst Bank Gateway, N.A.*, 894 F.2d 750, 754 (5th Cir.1990)). See also *Timberland Design, Inc. v. First Service Bank for Sav.*, 932 F.2d 46, 48 (1st Cir.1991). To invoke D'Oench Duhme as a bar to *depositors'* claims would defeat the very purpose of the doctrine. Cf. *FDIC v. La Rambla Shopping Center, Inc.*, 791 F.2d 215, 218 (1st Cir.1989).

■■■ Because neither the D'Oench Duhme doctrine nor § 1823(e) provides an answer to this case, it is necessary to consider the character of the Treasury bill proceeds at the time they were deposited to the plaintiffs' accounts, as it relates to the institutional, and quite distinct roles of the FDIC. The plaintiffs' principal contention is that the bank's failure to honor the directions given on their behalf requires that the excess funds be impressed with a constructive trust. The settled rule, however, is that when a general deposit of money is made in a commercial

bank, "the bank becomes a debtor to the depositor, with a superadded duty to honor the checks of the depositor, for a violation of which it may be held liable for damages. The bank is in no sense a trustee." 5 *Scott on Trusts* § 526 at 3670 (3d ed. 1967) (footnote omitted). The rule is no different when a bank fails to honor a depositor's instructions that money on general deposit be applied to a particular purpose.[6] "In such a case unless the bank actually sets aside specific money for the intended purpose, it can hardly be said that it has become a trustee.... If the bank fails before it sets aside the money, it is liable to the depositor only for breach of contract, and upon the bank's insolvency the depositor has no claim to priority over other creditors of the bank." *Id.*, § 546 at 3746. See also *Blakey v. Brinson*, 286 U.S. 254, 52 S.Ct. 516, 76 L.Ed. 1089 (1932) (no trust created where a bank failed to purchase government bonds as directed by a depositor despite its false assurances that it had done so). Moreover, a court of equity will impose a constructive trust only to avoid the unjust enrichment of a party that obtains legal title to property by means of a fraud or a fiduciary violation.[7] *Nessralla v. Peck*, 403 Mass. 757, 762, 532 N.E.2d 685 (1989); *Collins v. Guggenheim*, 417 Mass. 615, 618, 631 N.E.2d 1016 (1994). Here not only is there no credible suggestion of fraud on the part of the bank, it also cannot be said that the bank enriched itself at the plaintiffs' expense. By accepting deposit of the plaintiffs' funds, the bank accomplished the opposite result by enlarging the total sum of its liabilities.

■■■ Much of the plaintiffs' argument seems to confuse the FDIC's dual persona. The FDIC acts in two distinct capacities as a monitor of the banking system. When the

---

**5.** A deposit account is treated as a liability, not an asset, on a bank's balance sheet.

**6.** Although studiously vague, the affidavit of Dharshi Dupee (submitted by plaintiffs) indicates that the Treasury bills were purchased from funds on general deposit in preexisting BTB accounts. Dupee is the Corcoran Jennison representative who handled plaintiffs' accounts.

**7.** Plaintiffs' alternative suggestion of a bailment works at cross-purposes with their theory of a constructive trust. A bailment requires that the

bailor retain both beneficial interest and title in the thing deposited. Only when title (but not the beneficial interest) passes to the bank does a trust arise. An even more fundamental flaw in the bailment theory—at least from plaintiffs' perspective—is that a bailment creates neither a trust nor a debt, and consequently no insurance obligation on the part of the FDIC. The remedy for a violation of the terms of a bailment would be an action at law against the FDIC as receiver. That action at best would entitle the plaintiffs to no more than what they already have—a creditor's pro rata share of the receivership assets.

FDIC takes over a failed bank, it acts as a receiver. When the FDIC reimburses depositors for money lost as a result of a bank's failure, the FDIC acts in its corporate capacity as an insurer. If the plaintiffs are, as they claim, beneficiaries of a trust, that does not improve their position against the FDIC as receiver. "If a trustee dissipates the trust property and has nothing to show for it, the beneficiary is entitled to no priority over the trustee's general creditors." *5 Scott on Trusts,* § 525 at 3669 (3d ed 1967). In other words, no matter how they choose to frame their cause of action, the plaintiffs have no remedy against the FDIC as receiver other than the one generally available to all of the bank's creditors—a claim to a pro rata share of any recovered assets. See *Hale House Center, Inc. v. FDIC,* 788 F.Supp. 1309, 1317 (S.D.N.Y.1992).

Plaintiffs' alternative argument that their funds should be deemed trust funds for FDIC insurance purposes, while not very clearly made, has a basis in FDIC regulations. Funds held by a bank under instructions to invest were at the time BTB failed considered by the FDIC as "trust funds" within the meaning of 12 U.S.C. § 1817(i) and deemed separately insured. FDIC Advisory Opinion No. 88–63 (September 14, 1988). See also 12 U.S.C. § 1813(*l*)(3). Ultimately, however, the characterization of funds as trust funds for insurance purposes, according to FDIC regulations, is conclusively determined by a bank's records. 12 C.F.R. § 330.4. Here, because of the absence of any indication in BTB's records that the proceeds of the Treasury bills were held for investment, the FDIC declined excess coverage. Under the Administrative Procedure Act, FDIC deposit insurance determinations are not to be disturbed unless " 'found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " *McCloud v. FDIC,* 853 F.Supp. 556, 558 (D.Mass.1994) (quoting *Raine v. Reed,* 14 F.3d 280, 283 (5th Cir.

1994). For this reason, among others, courts have fairly consistently held that the FDIC's determinations of deposit insurance coverage are final even when a failed bank's records are later shown to be erroneous. See *Raine v. Reed, supra; Pool v. Resolution Trust Corp.,* 13 F.3d 880 (5th Cir.1994); *Metro County Title, Inc. v. FDIC,* 13 F.3d 883 (5th Cir.1994); *In re Collins Securities Corp.,* 998 F.2d 551 (8th Cir.1993). The rationale for according finality to the FDIC's insurance determinations is perhaps best stated in *Collins Securities Corp.:*

> We deal here with a statutory deposit insurance regime, created from the harsh reality of the Great Depression, when one-third of the nation's banks failed in a four-year period.... The premiums banks pay for this deposit insurance are based upon deposits as shown on their account records. Given this statutory scheme, it is plainly rational for [predecessor] FSLIC and FDIC to base their determination of whether a deposit account existed when the bank failed upon the same books and records from which premiums had been determined. To permit a failed bank's insured deposits to be inflated by extraneous evidence of additional obligations would violate fundamental insurance principles and jeopardize the financial integrity of the deposit insurance system. Thus, FSLIC's and FDIC's longstanding practice of looking primarily at the failed bank's deposit account records in determining insurance claims is clearly a permissible interpretation of their statutory mandates.... Deposit insurance protects depositors from loss due to the bank's insolvency, not loss from the bank's pre-insolvency mistakes, which is frequently covered by errors and omissions insurance. *Id.* at 554–555.[8]

The First Circuit, however, in *Villafane–Neriz, supra* at 40, n. 6, withheld judgment as to "whether or to what extent we would be willing to follow the Eighth Circuit's holding in *In re Collins Sec. Corp.* (holding that the

---

8. Funds that are held in trust "which the bank keeps segregated and apart from its general assets and does not use in the conduct of its business" are not included in a bank's quarterly report of conditions as part of its total deposit liability and consequently are not subject to assessment by the FDIC as part of the bank's deposit insurance premium. 3 Deal, et. al., *Banking Law,* § 42.05[3] at 23–24 (1994). Cf. *FDIC v. Philadelphia Gear Corp.,* 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986).

FDIC is not liable in its corporate capacity because no account existed at the time of the bank's failure due to a non-fraudulent pre-failure bank error") (citation omitted). The First Circuit avoided the insurance thicket again in *Fedders Air Conditioning, USA, Inc. v. FDIC*, 35 F.3d 18 (1st Cir.1994) explaining that:

> [I]t is unnecessary for us in this case to plunge ourselves into the morass of decisions that bear on whether and when *erroneous* bank records are conclusive against the depositor and when correctly recorded but *unauthorized* activity by a bank (e.g., paying an insured account to a thief) preclude an insurance claim. These cases reflect the severe tension between two values: the legitimate expectations of the depositor and the regulator's desire to rely upon existing records to expedite the handling of bank emergencies. Not surprisingly, the cases do not all point the same way. *Fedders, supra,* at 23 (footnote omitted, emphasis in original).

■ The issue has been addressed by at least one Massachusetts District Court. In *McCloud v. FDIC*, 853 F.Supp. 556 (D.Mass. 1994), Judge Saris acknowledged "a seemingly solid phalanx of law" supporting the FDIC's position that deposit insurance does not protect a depositor from a bank's pre-insolvency mistakes. *Id.* at 558. There is, however, a narrow, but well recognized exception to this rule, cited by Judge Saris, that requires the FDIC to assume insurance liability where a pre-insolvency deposit "error" arises from fraudulent conduct by bank employees. See *McCloud, supra* at 559; *Collins, supra,* at 555. Fraudulent conduct is not credibly alleged by the plaintiffs in this case.[9]

A second possible exception alluded to in *Collins* arises when a bank's pre-insolvency mistake takes the form of a failure to carry out the specific instructions of the depositor regarding the creation and initial classification of an account. "[C]ourts have given great deference to the agency's reliance upon the failed bank's account records, permitting the depositor to introduce additional evidence only to show that the bank 'did not follow the depositor's instructions as to the proper characterization of the account.'" *Collins, supra* at 555 (quoting *Abdulla Fouad & Sons v. FDIC,* 898 F.2d 482, 485 (5th Cir.1990)). Unlike the vast majority of pre-insolvency "mistake" cases which involve either the erroneous distribution of funds from a depositor's account,[10] or a mistake made by the depositor himself in setting up the account,[11] the factual dispute in this case involves the alleged handling of an account contrary to the instructions of the depositor.[12]

9. Plaintiffs allege in a conclusory fashion that the Treasury Direct form was "forged" by a BTB employee. To constitute a forgery, a writing must purport to be that of someone other than its maker. *Commonwealth v. Baldwin*, 77 Mass. 197, 198 (1858). A genuine instrument is not a forgery even if its maker inserts false statements of fact. "[T]elling a lie does not become forgery because it is reduced to writing." *In re Windsor*, 6 Best. 522, 530, 122 Eng.Rep. 1288 (1865). See also *U.S. v. Merklinger*, 16 F.3d 670, 673 (6th Cir.1994); *Gilbert v. U.S.*, 370 U.S. 650, 658, 82 S.Ct. 1399, 1403–04, 8 L.Ed.2d 750 (1962). Here the disputed form was filled out and signed by Kathleen Shea, a bank employee, in her own name. The plaintiffs do not seriously contest the genuineness of the form, only that it "did not accurately convey [the] plaintiffs' instructions."

10. See, e.g. *Raine, supra* (unauthorized withdrawals from a depositor's account are a general obligation of a failed bank but not an FDIC insured deposit) and *Collins, supra* (proceeds of a $100,000 certificate of deposit paid to the wrong party is an obligation of the failed bank but not of the FDIC as insurer).

11. See, e.g. *Kershaw v. Resolution Trust Corp.*, 987 F.2d 1206 (5th Cir.1993) (no coverage although bank employees negligently assured depositors that their structured accounts would be insured) and *Waukesha State Bank v. NCUAB*, 968 F.2d 71 (D.C.Cir.1992) (depositor opening three accounts in same name could not rely on oral assurances from credit union employees that, contrary to the plain face of the documents, the accounts would be treated as separately insured "nominee" accounts).

12. At least two other Circuits have acknowledged a possible exception to the certainty of records rule allowing a depositor to present extrinsic evidence of a bank's mischaracterization of the depositor's account. See *Jones v. FDIC*, 748 F.2d 1400, 1405 (10th Cir.1984) ("The bank records, if accurate and complete in reflecting the intention of the depositor conveyed to the bank, are conclusive in the interpretation of the account status. If a depositor challenges the bank records ... as to their correctness, there exists a presumption of correctness which may be overcome by proof that the records do not properly

The purpose of FDIC insurance is to afford depositors the comfort of knowing that they are protected from the calamity of an insolvency and the loss of their "hard earnings entrusted" to a bank. See *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 432–433, 106 S.Ct. 1931, 1935–36, 90 L.Ed.2d 428 (1986). This being the case, the exception to the certainty of records rule for fraudulent conduct by bank employees makes sense, as fraud by bank officers and employees is often the precipitating factor in a bank's demise. It is less clear that clerical errors by bank personnel have a similar effect on the financial health of banks in general.[13] If only for reasons of self-interest, a bank customer is ordinarily in the best position to protect himself from negligent errors committed by the bank in the handling of his account, and may be fairly held to bear a share of the risk if bank records do not accurately reflect his agreement with the bank. Cf. *FDIC v. Caporale*, 931 F.2d 1, 3 (1st Cir.1991). To hold the FDIC liable for the errors and omissions inherent in almost any routine banking transaction would divert the FDIC from its core mission of protecting the banking system from an ultimate catastrophe. It would convert a deposit insurance scheme conceived by Congress as coverage of last resort into a system of universal insurance, an obligation that Congress did not intend the FDIC to assume, nor one that would, as the FDIC's insurance scheme is currently constituted, be actuarially sound.

I am also troubled by the oral nature of the instructions that the plaintiffs allege were not followed in this case. Fraud for the most part leaves traces that can be documented. To hold that a depositor can claim the right to sue for excess insurance on a parol instruction that is contradicted by a failed bank's records, would, I fear, open the FDIC to a flood of fraudulent claims. While I recognize that D'Oench Duhme does not apply to this case, the larger policy concerns of the doctrine are no less implicated.

and accurately reflect the instructions of the depositor to the bank."); *Abdulla Fouad & Sons, supra* at 485–486 (the statutes and caselaw should be read "to permit proof that a federally insured bank did not follow the depositor's instructions as to the proper characterization of an account or ignored a request to correct such an

*ORDER*

For the foregoing reasons, the motion of the FDIC to dismiss is *ALLOWED*.

SO ORDERED.

error. It does not, however, extend beyond proof directed to deposit account records").

**13.** In theory, random acts of negligent record keeping should cancel one another out insofar as a bank's reckoning of its liabilities is concerned.