**TEXFUL TEXTILE LIMITED, Plaintiff,**

v.

**COTTON EXPRESS TEXTILE, INC., et al., Defendants.**

**No. CV 94–2192 RAP (Mcx).**

United States District Court, C.D. California.

May 25, 1995.

Steven I. Smith and Alan I. Kaplan, Herz-
feld & Rubin, Los Angeles, CA, for Texful
Textile Ltd.

John R. DaCorsi, DaCorsi & Cort, Woodland Hills, CA, for Cotton Exp. Textile, Inc., Nader Nourafchan, and Said Salek.

Janis Abrams, Irene Duryee Gilbert, and Martin E. Roberts, F.D.I.C.–Federal Deposit Insurance Corp., Legal Div., Los Angeles, CA, for the U.S. and Through the F.D.I.C. and the U.S.

## ORDER GRANTING SUMMARY JUDGMENT AND SUMMARY ADJUDICATION

PAEZ, District Judge.

On May 1, 1995, the Court heard three motions: plaintiff Texful Textile Limited's ("Texful") motion for summary judgment against defendant Federal Deposit Insurance Company ("FDIC") and the FDIC's motion for summary judgment against Texful, along with Texful's motion for summary adjudication against defendants Cotton Express Textile, Inc. ("Cotton"), Nader Nourafchan, and Said Salek. Upon full consideration of the moving, opposition, and reply memoranda, declarations, exhibits, authorities, and oral arguments of counsel, the Court hereby grants the FDIC's motion and denies Texful's cross-motion, and grants Texful's motion for summary adjudication against Cotton, Nourafchan, and Salek on the claim for conversion.

## I

### *INTRODUCTION*

Plaintiff Texful Textile Limited ("Texful") filed this action for breach of contract, money had and received, goods sold and ordered, and fraud against defendant Cotton Express Textile, Inc. ("Cotton") on April 5, 1994. Texful is a Hong Kong corporation; Cotton is a California corporation. The amount in controversy was alleged to be $124,618.85. The claims arose out of Cotton's alleged failure to pay for textiles ordered from Texful, which Texful delivered. One of the banks involved, Capital Bank of California, was placed in receivership with the FDIC appointed as receiver shortly thereafter. Texful submitted an administrative claim and received a Receivership Certificate of Proof of Claim, No. 544, in the amount of $124,618.45.

On June 1, 1994, Texful filed its First Amended Complaint, adding three defendants: Cotton's secretary and director, Nader Nourafchan; Said Salek (whose role was not specified in the pleading); and the United States by and through the Federal Deposit Insurance Corporation as Receiver for Capital Bank of California. Texful added two claims: conversion and conspiracy and for a judicial determination pursuant to 12 U.S.C. § 1821(d)(6)(A).[1] The FDIC's cross-claim against Cotton, Nourafchan, and Salek was filed on December 2, 1994.

The FDIC filed a motion for summary judgment on the grounds that Texful had received all it was entitled to receive and that the requirements of 12 U.S.C. §§ 1821 and 1823(e)[2] have not been met. Texful cross-

---

1. 12 U.S.C. § 1821(d)(6)(A) provides:
 (A) In general
 Before the end of the 60–day period beginning on the earlier of—
 (i) the end of the period described in paragraph (5)(A)(i) with respect to any claim against a depository institution for which the Corporation is receiver; or
 (ii) the date of any notice of disallowance of such claim pursuant to paragraph (5)(A)(i), the claimant may request administrative review of the claim in accordance with subparagraph (A) or (B) of paragraph (7) or file suit on such claim (or continue an action commenced before the appointment of the receiver) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).

2. 12 U.S.C. § 1823(e) provides:
 (e) Agreements against interests of Corporation
 (1) No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
 (A) is in writing,
 (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

moved against the FDIC on the ground that it was entitled to be treated as an insured depositor of Capital Bank.

Plaintiff Texful also moved for summary judgment against the remaining defendants on the ground that defendants obtained possession of the goods wrongfully. Defendants correctly observed that the motion is in reality one for summary adjudication because it does not address the remaining claims in the First Amended Complaint.

## II

### *RELEVANT FACTUAL BACKGROUND*

The following facts are undisputed and are drawn from the parties' statements of uncontroverted facts unless otherwise indicated.

On or about January 9, 1993, Texful and Cotton entered into a contract which provided that Texful would ship textile goods to Cotton for which Cotton would pay the amount of $136,078.20.

On or about January 20, 1993, Texful's bank, Hong Kong–Shanghai Bank transmitted to Capital Bank a cover letter enclosing a sight draft (# 1749/42) in the amount of $136,078.20, an invoice for textiles (# 1749/42), and a bill of lading (# APLU003551640). Texful's bank subsequently issued a credit, thus reducing the amount of the sight draft to $124,078.40. The bill of lading transmitted to Capital Bank was negotiable and could be used by anyone possessing it to obtain the goods it referred to, that is, 544 rolls of textiles.

Upon receipt of the cover letter and documents, Capital Bank transmitted an acknowledgement to Texful's bank. Capital's acknowledgement completed the creation of a transaction called a "Documentary Collection" or "D/P collection," governed by Publication No. 322 of the International Chamber of Commerce.[3] As a result, Capital could only release the bill of lading to defendants

(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(D) has been, continuously, from the time of its execution, an official record of the depository institution.

"against payment" in local currency which was immediately available. In addition, the buyer, Cotton Express, had to pay for the goods (that is, Capital Bank had to hold the sum of $124,078.40 for plaintiff's account) before it was entitled to possession of the bill of lading and the goods it described.

On June 15, 1993, defendant Said Salek appeared at Capital Bank and gave Bank Vice–President Jacques Naffaa Cotton Express check no. 3629 in the amount of $124,-078.40, and received the bill of lading. Declaration of Jacques Naffaa ("Naffaa Dec."), ¶¶ 7, 8. The account on which the Cotton Express check was written was overdrawn in the amount of $27,000. Defendants Nourafchan and Salek knew the account was overdrawn. Defendants Nourafchan and Salek are the sole shareholders and officers of Cotton Express.

The Cotton defendants do not dispute the fact that by obtaining the shipping documents with a bad check, payment was not effected, and defendants obtained the goods in violation of the stated terms of ICC Publication No. 322. Texful did not consent to defendants' action.

Defendants contend that they had arranged with Capital Bank to "pay" for the goods with the check drawn against insufficient funds which they would subsequently cover with a wire transfer of funds. Defendants never covered the bad check. (They contend that the FDIC take-over prohibited them from making deposits after June 18, 1993, but have not explained why they have not, to this day, paid Texful.)

Defendants took possession of the goods, sold them for a profit, and did not turn over the proceeds of the sale(s) to Texful. Salek's net worth is $2.5 million; Nourafchan's is $3.5 million. Defendants represented to Texful that they had "paid" for the goods, which Texful claims was false.

3. These documents are attached as Exhibit A to the FDIC cross-claim. Under "terms and conditions" on page 2 of the Collection Order, paragraph 2 states "Collections are subject to the Uniform Rules for Collections (1978 Revision), International Chamber of Commerce Publication No. 322."

Defendants claim they believed they had paid for the goods. They also state that Capital Bank was not bound by Publication No. 322 and that the way they conducted the transaction with Texful was a method they had used "on numerous occasions."

On June 18, 1993, the Superintendent of Banks for the State of California, in the Matter of Capital Bank of California, issued an Order for Liquidation and Order Taking Possession of Property and Business. The Superintendent also issued a Tender of Appointment as Receiver to the FDIC. The FDIC accepted appointment as Receiver pursuant to 12 U.S.C. § 1821(c) and California Financial Code § 3221.

Texful filed its administrative claim in the Receivership of Capital Bank. Evidently the full amount of the claim was allowed, but only as an unsecured claim, not as a claim against the deposits. The FDIC contends that the Bank had no deposit account records or depositor relationship with Texful when the Bank failed. Texful argues that the Bank had sufficient insured funds of Cotton Express on hand when Capital released the bill of lading. The FDIC claims that the two certificates of deposit that were in Salek's and Nourafchan's name were pledged to Capital Bank as collateral for a promissory note.

## III

### DISCUSSION

#### A

##### Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment "terminates the action without trial" and is a "judgment 'on the merits.'" Schwarzer, Tashima, and Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* ("*Fed.Civ.Proc.*"), § 14:28 (1994). Not only is summary judgment not "disfavored," but it

is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corporation v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

In a trilogy of 1986 cases, the Supreme Court clarified the standard for summary judgment. *See Celotex Corporation v. Catrett, supra; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Electrical Industry Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The Court determines a fact's materiality according to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. at 2510. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, its burden must be satisfied by affirmative admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554; *see also Fed.Civ.Proc.,* §§ 14:123–141.

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In assessing whether the non-moving party has raised a genuine issue, the Court must believe the nonmovant and draw all justifiable inferences in his favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14, *citing Adickes v. S.H. Kress and Company,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient. *Id.* at

252, 106 S.Ct. at 2512. As the Court explained in *Matsushita:*

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

475 U.S. at 586–87, 106 S.Ct. at 1356.

### B

### *Analysis*

1. *The Texful–FDIC Cross-motions*

■ In *In re Collins Securities Corporation (Bell v. FDIC )*, 998 F.2d 551, 554 (8th Cir.1993), the court reviewed the purpose behind the federal deposit insurance scheme:

> We deal here with a statutory deposit insurance regime, created from the harsh reality of the Great Depression, when one-third of the nation's banks failed in a four-year period. "The focus of Congress was therefore upon ensuring that a deposit of 'hard earnings' entrusted by individuals to a bank would not lead to a tangible loss in the event of a bank failure." *FDIC v. Philadelphia Gear Corp.,* 476 U.S. 426, 432–33, 106 S.Ct. 1931, 1935, 90 L.Ed.2d 428 (1986).

The court explained further that "one must own an insured deposit" to collect deposit insurance when a bank fails. *Id.* The court noted that banks pay deposit insurance premiums based on the "deposits as shown on their account records." As a result, "it is plainly rational for FSLIC or FDIC to base their determination of whether a deposit account existed when the bank failed upon the same books and records from which premiums had been determined." *Id.* The point of deposit insurance, the court added, was to protect "depositors from loss due to the bank's insolvency, not loss from the bank's pre-insolvency mistakes[.]" *Id.* at 555.

■ There is no dispute between Texful and the FDIC that Capital Bank erred. Indeed, FDIC contends that it recognized Capital's negligence by issuing to Texful the Receivership Certificate for the full amount owed. Texful asks the Court to do equity and to deem Texful an insured depositor of Capital Bank, not an unsecured creditor. Alternatively, Texful contends that the documentary collection, the "D/P transaction," was a "deposit." Neither of these contentions finds support in the statute, regulations, or case law, or, indeed, public policy.

The statute defines "deposit" as follows: the unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and for which it has given or is obligated to give credit, either conditionally or unconditionally, to a commercial, checking, savings, time, or thrift account, or which is evidence by its certificate of deposit, thrift certificate, investment certificate, certificate of indebtedness, or other similar name, or a check or draft drawn against a deposit account and certified by the bank or savings association, or a letter of credit or a traveler's check on which the bank or savings association is primarily liable: Provided, That, without limiting the generality of the term "money or its equivalent," any such account or instrument must be regarded as evidencing the receipt of the equivalent of money when credited or issued in exchange for checks or drafts or for a promissory note upon which the person obtaining any such credit or instrument is primarily or secondarily liable, or for a charge against a deposit account, or in settlement of checks, drafts, or other instruments forwarded to such bank or savings association for collection.

12 U.S.C. § 1813(*l* ). As the FDIC points out, the collection documents are not "money or its equivalent," nor could they have been "deposited" into the Bank. Although the Bank was charged to perform certain functions, *it* was not obligated to pay Texful; Cotton was.

The regulations do not help Texful's argument. To begin with, they express a commitment to "uniform national rules for deposit insurance coverage." *See* 12 C.F.R. 330.3(h). To effect this, the FDIC "shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository

institution" when it determines "the amount of insurance available to each depositor[.]" 12 C.F.R. § 330.4(a)(1). The FDIC can only consider claims for deposit insurance based on fiduciary relationships to the extent such relationships are "expressly disclose[d]" in the institution's records. 12 C.F.R. § 330.4(b)(1). The regulations contain exceptions, but in both instances, they relate to "deposit obligations." 12 C.F.R. § 330.4(b)(4).

The case law, furthermore, affirms the importance of FDIC's authority and ability to rely on an insolvent institution's records. For example, in *Nimon v. Resolution Trust Corporation,* 975 F.2d 240 (5th Cir.1992), the court upheld the RTC's decisions regarding the proper amount of deposit insurance. The court rejected plaintiffs' argument that the RTC should "consider the subjective intention of depositors in setting up or structuring their accounts":

> The intent of the statutory and regulatory schemes is that the FDIC or RTC move quickly in order to maintain the going concern value of failed institutions and to avoid significant disruptions in their banking services.... The deposit insurance agencies operate under time constraints which justify rules that they rely upon the failed institution's books and records....

975 F.2d at 245 (citations omitted). The special consideration that the depositors in *Nimon* sought was at least premised on their status as account holders. Texful, obviously, lacks even that basis for its contention that it should receive deposit insurance.

The Fifth Circuit reached a similar conclusion in *Metro County Title, Inc. v. FDIC,* 13 F.3d 883 (1994), regarding the FDIC's obligation to give conclusive effect to account records. In that case, the FDIC found that certain cashier's checks, which had been purchased right before the bank collapsed, belonged to one depositor individually, resulting in an insurance payment of just $100,000 on its $1.44 million deposit. The court quickly dismissed the idea of requiring the FDIC to look beyond the bank records, that is, in this instance, the face of the cashier's checks: "Few provisions encourage the FDIC to investigate extraneous records[.]" 13 F.3d at 887.

Again, in *Fletcher Village Condominium Association v. FDIC,* 864 F.Supp. 259 (D.Mass.1994), the court rejected the plaintiffs' "principal contention that the bank's failure to honor the directions given on their behalf requires that the excess funds be impressed with a constructive trust." Not unlike Texful, plaintiffs in *Fletcher Village* argued alternatively that the court should *deem* their funds trust funds for insurance purposes. 864 F.Supp. at 263. Emphasizing the conclusive effect of the bank's records, the court denied plaintiffs' requests. The court acknowledged the strong precedent "supporting the FDIC's position that deposit insurance does not protect a depositor from a bank's pre-insolvency mistakes." The court noted certain exceptions pertaining to *deposit* errors, namely bank employee fraud or failure to follow the depositor's instructions regarding creation or classification of an account. Even so, the court still reasoned that a depositor was in the best position to protect himself and ought to bear the risk "if bank records do not accurately reflect his agreement with the bank." *Id.,* at 265. In any event, there is no question that Texful never instructed Capital to open an account and has not contended there was bank employee fraud (rather than negligence). It follows, then, that Texful's position is not as strong as the one the court rejected in *Fletcher Village.*[4]

Texful seeks to analogize the documentary collection to a letter of credit, arguing that Capital Bank itself became obligated to pay

---

**4.** As the FDIC argues persuasively, *FDIC v. Fedders Air Conditioning, USA, Inc.,* 35 F.3d 18 (1st Cir.1994), does not provide Texful with the needed support. In that case, the bank had signed an escrow agreement acknowledging that it had received $250,000 which was to be held in escrow and invested in "a commercial bank money market account." *Id.* at 20. The bank failed to do so. The court found that the bank was obligated to give credit to the depositor and that the records adequately reflected the obligation. Here, Capital Bank did not give Texful credit, nor was it supposed to. It also had no obligation to open an account for Texful. Capital Bank, like plaintiff's bank in Hong Kong, merely facilitated the transaction—the money was never supposed to be held in an account for Texful, but rather disbursed immediately.

Texful. Even a brief review of the nature of documentary collections shows that by definition, banks operate solely as conduits in these transactions. Indeed, this is one reason why they are considered riskier than letters of credit. *See e.g.,* John B. Hendricks, "Financing the Export Transaction," 458 *PLI/Commercial Law and Practice Course Handbook Series* 55 (May 1, 1988), p. 2 ("The buyer and seller agree that when the time comes to pay for the goods, the seller will present certain documentation through its bank to a specified bank in the buyer's country which will present the documents to the buyer. The buyer will then make payment through his bank, which will then send the payment to the seller's bank which will pay the seller. Note that neither bank guarantees payment or assumes any credit risk. The banks act merely as intermediaries to facilitate payment for the goods.") *See also* Menachem Mautner, "Letter-of-Credit Fraud: Total Failure of Consideration, Substantial Performance and the Negotiable Instrument Analogy," 18 *Law & Policy International Bus.* 579 (1986), p. 9 ("the seller's expectation interest is not protected under the collection transaction. The seller ships goods in reliance on the buyer's contractual undertaking to effect payment to the seller, but not in reliance on such an undertaking on the part of the bank.")

In sum, neither the applicable law nor the nature of the transaction between Texful and Cotton support the relief that Texful urges the Court to grant. Texful's motion is therefore denied and the FDIC's motion is hereby granted.

## 2. *Texful's Motion Against Cotton*

Although Texful has moved for summary judgment, the motion concerns only one of the five claims asserted against Cotton, namely, the Fifth Claim for conversion and conspiracy, and is thus a motion for summary adjudication under Fed.R.Civ.P. 56(d).

Conversion is the "actual interference with the plaintiff's 'dominion,' i.e., with his ownership or right of property." 5 B. Witkin, *Summary of California Law,* "Torts," § 615 (9th ed. 1988) (citations and emphasis omitted). Witkin adds that "[t]he *act* must be knowingly or intentionally done, but a *wrongful intent* is not necessary." *Id.,* § 624 (emphasis in original). An "unauthorized sale or other transfer of property is a conversion." *Id.,* § 621.

Texful argues that it had the right to possession of the textiles before Capital Bank released the bill of lading to Cotton and that Cotton "violated plaintiff's right to control the property when they procured the shipping documents from the collecting bank by providing the bank a check which was drawn against insufficient funds." Cotton argues that when the goods arrived in Los Angeles and when Texful delivered the relevant documents to Capital Bank, title passed, and no claim for conversion could therefore arise. At most, Cotton adds, Texful can state a claim for breach of contract. Cotton further argues that the Uniform Rules of Collection did not apply.[5]

It is undisputed that Cotton's exercise of dominion occurred after the goods were shipped. The International Chamber of Commerce's "Incoterms 1990"[6] do not deal with "title or other property rights of the seller and buyer; title issues are resolved by the parties' agreement or by the applicable local law." CEB *Sales & Leases* § 8.1. Thus, either the parties' agreement or California law controls here.

---

**5.** This last point seems a bit disingenuous considering Cotton's agreement that the following two facts, among others, were uncontroverted:

5. The cover letter and attached documents, when acknowledged by Capital Bank, created a transaction known as a "Documentary Collection" (or D/P collection—documents against payment collection), governed by Publication No. 322 of the International Chamber of Commerce.

6. In a Documentary Collection transaction (or D/P collection) defendants' bank (Capital Bank) was only allowed to release the bill of lading to the defendants "against payment" in local currency which is *immediately available.* (Emphasis added.)

**6.** "Incoterms 1990" are "the most widely recognized sets of nonstatutory definitions" for foreign trade. *See* 1 CEB *Sales & Leases in California Commercial Law Prac.* ("CEB *Sales & Leases*") § 9.15 (1993).

The provisions of section 2401 of the California Commercial Code dictate the passing of title "[u]nless otherwise specifically agreed[.]" In this case, the parties agreed that the purchase and sale would take the form of a documentary collection transaction. The parties' agreement and the Uniform Rules for Collections obligated Capital Bank to follow the parties' instructions and to "release the documents to the drawee against payment in local currency which is immediately available for disposal in the manner specified in the collection order." Unif.Rules of Coll., Art. 12. The Collection Order here specified "USD," that is, U.S. Dollars. In short, by agreeing to proceed by way of a documentary collection transaction, the parties contemplated that neither title nor possession would pass until Texful was paid in full. Indeed, the very nature of the transaction confirms this. *See* John B. Hendricks, "Financing the Export Transaction," *supra,* p. 3. Until Texful was paid, Cotton could not obtain the title documents that would enable it to take possession of the textiles.

The Commercial Code also conditions the seller's duty to tender and complete any delivery on the buyer's tender of payment. Comm.C. § 2511. Moreover, the Code specifies that "payment by check is conditional and is defeated as between the parties by dishonor of the check on due presentment." Comm.C. § 2511(3). In this case, Cotton knowingly presented a check drawn on insufficient funds which obviated Texful's duty to tender and complete any delivery. Title and the right to possession remained with Texful. Cotton's presentation of a dishonored check to procure first the bill of lading and then the goods violated plaintiff's rights [7] and thus constituted conversion. Texful is entitled to judgment on this claim.

In addition, as officers of Cotton, Nourafchan and Salek are individually liable for conversion as a result of their direction, authorization, and participation in the tortious conduct. *Wyatt v. Union Mortgage Company,* 24 Cal.3d 773, 785, 157 Cal.Rptr. 392, 399, 598 P.2d 45, 51–52 (1979) (in bank);

*cf. Black v. Bank of America N.T. & S.A.,* 24 Cal.App.4th 672, 23 Cal.Rptr.2d 543 (1993) (no conspiracy where bank employees carried out but did not create bank policies). They concede that they knew they lacked adequate funds at the time they presented the check and obtained the title documents. Their actions rendered them individually liable, along with their company.

## IV

### *CONCLUSION*

For all the reasons set forth above, the FDIC's motion for summary judgment is granted, Texful's motion for summary judgment against the FDIC is denied, and Texful's motion for summary adjudication against Cotton, Nourafchan, and Salek is granted on Texful's claim for conversion.

**IT IS SO ORDERED.**

---

7. Even if title passed before Cotton presented the bad check, it had no right to possess the goods until it paid Texful in full. Texful properly sued for conversion based on its legal title *or* its right of possession. 5 B. Witkin, *Summary of California Law,* "Torts," § 618 (9th ed. 1988).