USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 93-1487 MIGUEL VILLAFANE-NERIZ, INSURANCE COMMISSIONER OF PUERTO RICO, Plaintiff, Appellant, v. FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant, Appellee. _____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Juan M. Perez-Gimenez, U.S. District Judqe] ___________________ _____________________ Before Breyer, Chief Judge, ___________ Boudin and Stahl, Circuit Judges. ______________ _____________________ Carlos J. Morales-Bauza with whom Jesus R. Rabell-Mendez and ________________________ ________________________ Rossello-Rentas & Rabell-Mendez were on brief for appellant. _______________________________ J. Scott Watson, Senior Attorney, with whom Ann S. DuRoss, _________________ ______________ Assistant General Counsel, and Richard J. Osterman, Jr., Senior __________________________ Counsel, were on brief for appellee. ___________________ April 4, 1994 ___________________ STAHL, Circuit Judge. In this appeal plaintiff ______________ seeks the proceeds of a certificate of deposit issued by a now-failed bank. Simultaneously with its purchase, the certificate was assigned to a third party, the Insurance Commissioner of the Commonwealth of Puerto Rico ("the Commissioner"). The Commissioner brought suit against the FDIC seeking to establish his right to the proceeds of the certificate, and attempted to introduce documents evidencing both the assignment and the bank's acknowledgment thereof. The district court applied 12 U.S.C. 1823(e) to bar the assignee's use of the assignment documents. Finding both section 1823(e) and the D'Oench1 doctrine inapplicable, we _______ reverse. I. I. __ FACTUAL BACKGROUND AND PRIOR PROCEEDINGS FACTUAL BACKGROUND AND PRIOR PROCEEDINGS ________________________________________ The facts of this case are essentially undisputed. In order to do business in the commonwealth, Puerto Rico insurance companies are first required by law to deposit funds with the Commissioner. See 26 L.P.R.A. 801-809. ___ Moreover, once these funds are deposited, Puerto Rico law provides that they may not be levied upon by creditors or ____________________ 1. As we pointed out in McCullough v. FDIC, 987 F.2d 870, __________ ____ 874 (1st Cir. 1993), section 1823(e) is "somewhat loosely described as the codification" of the D'Oench doctrine, and _______ the parties' briefs in this case address both D'Oench and its _______ "statutory partner," id. at 874 n.6. Seeing no reason to ___ except D'Oench from our discussion, we address the _______ application of both doctrines. -2- 2 claimants of the insurance company. Id. 809 ("No judgment ___ creditor or other claimant of an insurer shall levy upon any deposit held pursuant to this chapter, or upon any part thereof."). On July 20, 1983, in order to satisfy the statutory deposit requirement, Guaranty Insurance Co. ("Guaranty") purchased a six-month certificate of deposit from the Girod Trust Company ("Girod" or "the bank") in the principal amount of $50,000. The certificate of deposit had a maturity date of January 17, 1984. On the same day that it purchased the certificate, Guaranty, through one of its officers, executed a separate document entitled a "Fiduciary Assignment" in which it irrevocably assigned and conveyed its interest in the certificate of deposit to the Commissioner. Girod was not a party to the Fiduciary Assignment. Accompanying both the certificate of deposit and the Fiduciary Assignment was yet another document executed on the same date, July 20, 1983, entitled "Requisition to the Bank." This Requisition stated, inter alia, that Girod would _____ ____ not release the funds represented by the certificate of deposit, "whether the principal value or income thereof," without the authorization of the Commissioner. More specifically, the Requisition stated, "[W]e [Girod] agree and promise to dispose of the certificate of deposit . . . only with prior authorization from the Commissioner of Insurance of Puerto Rico." The Requisition was signed by -3- 3 Allwin Perez "in his capacity as manager of the San Juan branch of Girod Trust Company." His signature was notarized. Like the Fiduciary Assignment, the Requisition stated, "This requisition will be irrevocable." The certificate of deposit itself was given to, and remains with, the Commissioner. Less than three months after purchasing the certificate of deposit from Girod, Guaranty executed a loan agreement, unrelated to the certificate of deposit, pursuant to which it borrowed $600,000 from Girod. The loan was evidenced by a promissory note for that amount, payable to Girod. The note was due on April 26, 1984, and Guaranty began making payments according to the loan agreement's schedule. On January 17, 1984, the certificate of deposit came due. At the request of Guaranty, it was "rolled over," i.e., extended for a term of six additional months. In the meantime, Guaranty had fallen behind on payments due to Girod under the $600,000 loan agreement. On July 16, 1984, the certificate of deposit came due again. This time, however, the certificate was not "rolled over." Rather, on July 18, 1984, two days after the certificate had matured, the proceeds were credited to Guaranty's account. Specifically, $50,000 from the certificate of deposit was credited toward Guaranty's outstanding indebtedness under the $600,000 loan agreement. -4- 4 On August 16, 1984, Girod was declared insolvent and the FDIC was appointed receiver. On December 19, 1984, Guaranty also became insolvent. The Commissioner was appointed Guaranty's receiver. On August 25, 1986, the Commissioner filed a proof of claim with the FDIC, seeking payment on the certificate of deposit. On May 22, 1991, having received no payment on the claim, the Commissioner filed a complaint against the FDIC in the Superior Court of Puerto Rico seeking to recover the proceeds of the certificate of deposit. The FDIC removed the action to federal court pursuant to 12 U.S.C. 1819(b). The parties filed cross-motions for summary judgment.2 Without ruling on the motions, the district court asked the parties to submit briefs on the application of 12 U.S.C. 1823(e).3 Upon submission of the briefs,the district ____________________ 2. The Commissioner argued, in essence, that the offset was improper and that he was entitled to the proceeds of the certificate of deposit. The FDIC argued, inter alia, that _____ ____ the Commissioner's claim was barred by laches. 3. Section 1823(e) states: No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement-- 1) is in writing, -5- 5 court held that section 1823(e) barred the Commissioner's reliance upon either the Fiduciary Assignment or the Requisition (also referred to hereinafter as "the assignment documents"). In essence, the court reasoned that the assignment documents constituted an "agreement which tends to diminish or defeat the interest of" the FDIC in an asset for purposes of section 1823(e). The district court went on to reason that, because the assignment documents failed to meet the requirements set out in section 1823(e), e.g., they were approved by neither the bank's board of directors nor its loan committee, the Commissioner was barred from relying upon them. Therefore, the district court ordered summary judgment in favor of the FDIC.4 ____________________ 2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, 3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and 4) has been, continuously, from the time of its execution, an official record of the depository institution. 4. The district court also summarily concluded that the assignment of the certificate of deposit "was not validly consented to by [Girod], represented by Mr. Perez." The proceedings below reflect only that Girod may have had an internal procedure which required that two qualified employees, rather than a single employee, sign agreements -6- 6 II. II. ___ DISCUSSION DISCUSSION __________ The sole issue before us is whether section 1823(e) bars the Commissioner from relying on the Fiduciary Assignment and the Requisition in making his claim against the FDIC. We hold that the Commissioner is not so barred. A. Standard of Review ______________________ Where, as here, the essential facts are undisputed and the sole issue on appeal involves a pure question of law, our review is de novo. See, e.g., FDIC v. Keating, 12 F.3d __ ____ ___ ____ ____ _______ 314, 316 (lst Cir. 1993). B. Bank Assets and Bank Liabilities ____________________________________ We begin with crucial, if rudimentary, banking terminology. As one commentator recently noted, "It may be helpful to recall that banks and thrifts have a somewhat counterintuitive perspective on the accounting of deposits, which appear on their balance sheets as liabilities. ___________ ____________________ which bound Girod. We agree with the Commissioner that the bank's own internal procedures are not necessarily dispositive on the issue of whether the bank was bound by Perez's signature. See, e.g., 10 Am. Jur. 2d Banks 99 (1963) ___ ____ _____ ("[W]hen a bank opens its doors for business with the public and places officers in charge, persons dealing with them in good faith and without any notice of any want of authority will be protected where an act is performed in the apparent scope of the officer's authority, whether the officer is actually clothed with such authority or not."). The FDIC has offered no argumentation or authority to the contrary, either below or on appeal. Thus, we conclude that the record does not support a conclusion as a matter of law that the assignment was invalid. -7- 7 Meanwhile, loans from banks appear on their balance sheets as assets." David G. Oedell, Private Interbank Discipline, 16 ______ _____________________________ Harv. J.L. & Pub. Pol'y 327, 384 n.206 (1993) (emphasis added). In other words, bank deposits, including certificates of deposit such as the one at issue here, see 12 U.S.C. ___ 1811(1) (defining a deposit as, inter alia, "the unpaid ____ balance of money or its equivalent received or held by a bank . . . which is evidenced by its certificate of deposit"), represent obligations on the part of a bank to repay funds to depositors. As such, they are reflected on a bank's books as liabilities. Loans made to bank customers, on the other hand, represent obligations on the part of borrowers to repay sums certain to the bank, and as such are reflected on a bank's books as assets. Obviously, the books of failed banks contain both assets and liabilities. The FDIC fulfills vastly different functions as to the two sides of a failed bank's ledger sheet. C. The Role of the FDIC in Bank Failures and the Purpose of ____________________________________________________________ D'Oench and Section 1823(e) ___________________________ The role of the FDIC in bank failures is well established. Its "basic mission is to protect insured depositors," FDIC v. La Rambla Shopping Ctr., Inc., 791 F.2d ____ _____________________________ 215, 218 (lst Cir. 1986), which it does by "undertaking an obligation to pay depositors when an insured bank fails." FDIC v. Nichols, 885 F.2d 633, 636 (9th Cir. 1989). In other ____ _______ -8- 8 words, satisfying a failed bank's liabilities, especially its deposits, is a primary goal of the FDIC. A failed bank's assets, on the other hand, are either liquidated or transferred to a solvent bank.5 See, ___ e.g., FDIC v. P.L.M. Int'l, Inc., 834 F.2d 248, 254 (lst Cir. ____ ____ __________________ 1987). Needless to say, not all borrowers (i.e., obligors with regard to the bank's assets) happily meet their ______ obligations toward a failed bank, and many attempt to assert claims and defenses against the FDIC aimed at relieving those obligations. The doctrines enunciated in D'Oench, Duhme & _________________ Co. v. FDIC, 315 U.S. 447 (1942), and its statutory ___ ____ counterpart, 12 U.S.C. 1823(e), greatly limit the types of claims and defenses that borrowers may assert against the FDIC. In essence, such claims and defenses are limited to those that are based on documentation in the failed bank's records. Moreover, these doctrines governing the claims and defenses of borrowers are designed to enable the FDIC to meet _________ more effectively its obligations to pay depositors. See, __________ ___ ____________________ 5. Admittedly, the FDIC often, as it did here, transfers obligations on both sides of a failed bank's ledger sheets to ____ a solvent bank. In such situations, the solvent bank "purchases" certain of the failed bank's assets, and simultaneously "assumes" that bank's liabilities, i.e., its deposits. Such a transaction is known commonly as a "purchase and assumption" transaction. See, e.g., Timberland ___ ____ __________ Design Inc. v. First Serv. Bank for Savs., 932 F.2d 46, 48 ___________ ___________________________ (lst Cir. 1991); La Rambla, 791 F.2d at 218. Depositors then _________ maintain their insured deposits, while borrowers continue to meet their obligations, allowing banking business to continue with some regularity. -9- 9 e.g., Timberland Design Inc. v. First Serv. Bank for Savs., ____ _______________________ ___________ ______________ 932 F.2d 46, 48 (lst Cir. 1991) ("`[T]he D'Oench Duhme ______________ doctrine . . . favors the interests of depositors and __________ creditors of a failed bank, who cannot protect themselves from secret agreements, over the interests of borrowers, who _________ can.'") (emphasis supplied) (quoting Bell & Murphy & Assocs., ________________________ Inc. v. Interfirst Bank Gateway, N.A., 894 F.2d 750, 754 (5th ____ _____________________________ Cir.), cert. denied, 498 U.S. 895 (1990)). _____ ______ D. The Assignment Documents: Agreements Affecting a Bank _____________________________________________________________ Deposit _______ Turning to the transaction here, it is evident that at the time the certificate of deposit was purchased and the Fiduciary Assignment and the Requisition were executed, they were agreements having an effect on one of Girod's insured deposits,6 rather than one of its assets. The significance of this distinction is made clearer if we examine, step by step, the banking transactions at issue. ____________________ 6. As to the existence of an insured deposit in this case, we cannot say, given the state of the record below, whether or to what extent we would be willing to follow the Eighth Circuit's holding in In re Collins Sec. Corp., 998 F.2d 551, ________________________ 554-55 (8th Cir. 1993) (holding that the FDIC is not liable in its corporate capacity because no account existed at the time of the bank's failure due to a non-fraudulent pre-failure bank error). We merely point out to the parties that similar issues may arise on remand, along with possible jurisdictional issues. See La Rambla, 791 F.2d at 220-21 ___ __________ (finding no jurisdictional basis under 12 U.S.C. 1819(b)(2)(D) or (E) for counterclaim against FDIC in its capacity as receiver). -10- 10 It is undisputed that Guaranty purchased and assigned the certificate of deposit on July 20, 1983. Suppose that Girod had failed the following day, i.e., after the purchase and assignment of the certificate of deposit, but before Guaranty borrowed any funds from Girod. If at that point the Commissioner sought payment from the FDIC, we think it indisputable that neither D'Oench nor section _______ 1823(e) would be implicated at all. Section 1823(e) would be inapplicable because, by its terms, that section applies only to agreements which "tend to diminish or defeat the interest of the FDIC in any asset acquired by it." Prior to Guaranty's taking of its _____ $600,000 loan, Guaranty's certificate of deposit was merely an insured deposit, unrelated to any particular Girod asset. Given that the Commissioner's claim would diminish no Girod asset, and would merely amount to a claim on an insured deposit, section 1823(e) would have no application. Nor would the D'Oench doctrine, in the absence of _______ section 1823(e), apply in such a situation. At its broadest, the D'Oench doctrine disallows claims and defenses based on _______ schemes or arrangements "whereby banking authorities would be misled." FDIC v. Caporale, 931 F.2d 1, 2 (lst Cir. 1991). ____ ________ Prior to the $600,000 loan to Guaranty, the assignment presented no such threat. Bank examiners would have been fully aware of the bank's liability on the certificate of -11- 11 deposit, and the Commissioner's claim merely would present an issue as to who was entitled to payment. Moreover, the FDIC does not argue that the loan to Guaranty, in and of itself, altered the validity of the assignment. In sum, prior to the bank's crediting of the _____ proceeds of the certificate of deposit toward Guaranty's outstanding indebtedness, this case involved an insured bank deposit, rather than a bank asset. It is equally indisputable that prior to that crediting transaction, neither section 1823(e) nor D'Oench would have applied to bar _______ the Commissioner's reliance upon the Fiduciary Assignment or the Requisition in establishing his right to the proceeds of the certificate of deposit. Rather, the FDIC, as it does with other deposits, would have paid the proceeds from the certificate of deposit to the Commissioner7 upon his establishing his right to those proceeds. Cf. In re Collins ___ _____________ Sec. Corp., 998 F.2d 551, 553 (8th Cir. 1993) (stating that __________ FSLIC, as receiver for failed bank, allowed unsecured claim by assignee of certificate of deposit which had been wrongly paid out to assignor). ____________________ 7. Absent the crediting of the certificate of deposit toward Guaranty's indebtedness, the Commissioner would have been entitled to its proceeds either in his capacity as assignee, or in his capacity as Guaranty's receiver. The FDIC does not object to the capacity in which the Commissioner now brings this appeal, and we therefore assume, without prejudice to the district court's ability to determine otherwise, that the Commissioner seeks recovery in his proper capacity. -12- 12 E. Reverse Alchemy: Do Girod's Pre-failure Actions Turn _____________________________________________________________ Gold ____ into Lead _________ With breathtaking legerdemain, the FDIC assumes that, upon Girod's crediting of the proceeds of the certificate of deposit toward Guaranty's $600,000 debt, the Fiduciary Assignment and the Requisition were transformed into agreements which tend to diminish the interests of the FDIC in an asset for purposes of section 1823(e). We decline _____ to adopt such a rule for three related reasons. First, assuming that the Commissioner's version of facts is correct, Girod's crediting of the certificate of deposit toward Guaranty's $600,000 loan and the resulting "relationship" between the certificate of deposit and the loan, cannot be characterized as anything other than ineffective. At the time that Girod "credited" the certificate of deposit toward Guaranty's outstanding indebtedness, the certificate of deposit had already been validly assigned to the Commissioner. Moreover, as noted above, Puerto Rico law specifically prohibits creditors of insurance companies from levying upon the statutory deposit at issue here. In other words, given the valid assignment, as well as the additional statutory protection it is afforded, the certificate of deposit could never rightfully become security for Girod's loan to Guaranty. If the certificate could never rightfully secure -13- 13 Guaranty's loan in the first instance, we see no principled way of now holding that it is nonetheless sufficiently related to that loan so as to "diminish" the FDIC's interest in the loan for purposes of section 1823(e). Second, if the bank's actions in this case somehow "magically" transformed agreements about a deposit into agreements which diminish the FDIC's interest in a bank asset, then all agreements about deposits, even those whereby a deposit is created, could potentially be subject to section 1823(e). In other words, any time a bank, prior to its failure, improperly closed a passbook savings account and credited the proceeds therein toward outstanding indebtedness from an entirely unrelated account, the depositor would be without remedy, inasmuch as passbook savings accounts are rarely, if ever, created with the approval of bank boards of directors or bank loan committees. See 12 U.S.C. ___ 1823(e)(3). We have no doubt that Congress could not have intended such a result. Third, neither the Fiduciary Assignment nor the Requisition constitutes an "agreement" for purposes of section 1823(e). Cf. Bateman v. FDIC, 970 F.2d 924, 927-29 ___ _______ ____ (lst Cir. 1992) (holding that bank's consent to mechanics' lien was not an "agreement" for purposes of section 1823(e)). The bank's "acceptance" of the assignment here did not involve bargaining, consideration, an exchange of promises, -14- 14 or many other ordinary accoutrements of a classical contractual "agreement." See Langley v. FDIC, 484 U.S. 86, ___ _______ ____ 91 (1987) (defining "agreement" as used in section 1823(e) in terms of traditional contract principles). Rather, the bank's "acceptance" of the assignment in this case appears very similar to the mortgagee's "consent" to the imposition of a mechanic's lien in Bateman. "Consent" in Bateman was _______ _______ required by state law to give the mechanic's lien priority over the mortgagee's lien. Bateman, 970 F.2d at 927-29. We _______ held there that the mortgagee's "consent" did not amount to an "agreement" for purposes of section 1823(e). Id. Here, ___ the state law mechanism whereby the certificate of deposit was created, assigned to the Commissioner, and further protected from levying by creditors is similar to the state mechanic's lien system in Bateman. Thus, for quite similar _______ practical and conceptual reasons, we reach a similar result. As a final argument urging a contrary result, the FDIC relies heavily on language on the reverse side of the certificate of deposit itself, which states that the proceeds of the certificate may be applied against the named obligee's outstanding indebtedness. The rationale behind this argument appears to be that this language warned the Commissioner that Girod had a right, upon maturity of the certificate, to credit the certificate of deposit against outstanding indebtedness on a bank asset, and that therefore the -15- 15 Commissioner, though still an obligee of the bank, should _______ have sought written board approval of the assignment, much as a D'Oench-wary obligor would. Again, we disagree. _______ First, the certificate of deposit was, by its terms, assignable.8 Second, the FDIC's argument places depositors and their assignees essentially in the same position as borrowers, requiring that they guard against purely contingent (and in this case, contractually and statutorily forbidden) bookkeeping maneuvers on the part of the failed bank. Moreover, in this case, such an expansive reading of the dual doctrines would penalize rather than reward, a depositor who, unlike most other depositors, took steps to preserve and memorialize his rights. We decline to adopt such a novel and onerous reading of the relevant law. We reemphasize that this case does not involve an effort by a borrower who, having promised his bank deposits as security for a loan, later attempts to destroy that security by asserting an oral promise by the bank to release that security notwithstanding the prior written commitment. Here, the borrower did not promise the certificate of deposit as security for its loan and, indeed, did not even own the ____________________ 8. Language on the reverse side of the certificate of deposit stated: The assignment of this Certificate to a third party will not be considered valid until said transaction has been notified to, and accepted by the bank. -16- 16 certificate of deposit at the time it borrowed the money from the bank, for it had previously assigned the certificate of deposit to the Commissioner. Moreover, the borrower in this case, namely Guaranty, is not claiming any rights at all to the funds at issue. Rather, the sole issue before us is whether section 1823(e) applies to bar the Commissioner's claims, and we conclude that it does not. III. III. ____ CONCLUSION CONCLUSION __________ For the foregoing reasons, the order of the district court entering summary judgment in favor of the FDIC based upon the application of 12 U.S.C. 1823(e) is Reversed and remanded for further proceedings ___________________________________________________ consistent with this opinion. _____________________________ -17- 17